## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | | |
|---|---|---|
| In re: | § | **Chapter 11** |
| | § | |
| **TROPHY HOSPITALITY, LLC,**[1] | § | **Case No.: 21-40512** |
| | § | |
| Debtor. | § | |
| | § | |

### DECLARATION OF KALEISHA STUART IN SUPPORT OF:
### MOTION OF LANDLORD BLUE STAR FRISCO RETAIL, LLC FOR AN ORDER (I) IN THE ALTERNATIVE (A) CONFIRMING THAT THE AUTOMATIC STAY HAS BEEN TERMINATED PURSUANT TO SECTION 362(J) OF THE BANKRUPTCY CODE BECAUSE THE LEASE TERMINATED PREPETITION; OR (B) GRANTING RELIEF FROM THE AUTOMATIC STAY; AND (II) COMPELLING DEBTOR'S COMPLIANCE WITH APPLICABLE LAW AND LEASE PENDING DEPARTURE

I, Kaleisha Stuart, pursuant to section 1746 of title 28 of the United States Code, hereby declare that the following is true and correct to the best of my knowledge, information, and belief:

1.      I am an authorized representative of Blue Star Frisco Retail, LLC (the "<u>Landlord</u>"), as counsel for an affiliate of the Landlord, the Dallas Cowboys, where I have been employed since February 2016.  Except as otherwise indicated herein, the facts set forth in this declaration (the "<u>Declaration</u>") are based on my personal knowledge of the Landlord, the above-captioned debtor and debtor in possession (the "<u>Debtor</u>"), my review of relevant documents, information provided to me by employees of or advisors to the Landlord or my opinion based upon my experience and knowledge.  If called to testify, I would testify competently to the facts set forth in this Declaration on that basis.

2.      I submit this Declaration in support of the *Motion of Landlord Blue Star Frisco Retail, LLC for an Order (I) in the Alternative (A) Confirming that the Automatic Stay has been*

---

[1] The Debtor's address is 3351 Waverly Drive, Celina, TX 75009.  The last four digits of its tax identification number are 5814.

*Terminated Pursuant to Section 362(j) of the Bankruptcy Code Because the Lease Terminated Prepetition; or (b) Granting Relief from the automatic Stay; and (II) Compelling the Debtor's Compliance with Applicable Law and Lease Pending Departure* (the "Motion").[2]

3.      The Star District in Frisco ("The Star") is the campus of the Dallas Cowboys World Headquarters.[3]  The Star is a perfect place to shop, dine, and explore the Dallas Cowboys themed campus.  The Debtor operates a bar and restaurant at The Star doing business under the name Trophy Park, which is situated across a roadway from residential buildings.

4.      The Landlord and the Debtor entered into a "Shopping Center Lease" dated October 26, 2016, which was amended by the First Amendment to Shopping Center Lease dated December 13, 2018, the Second Amendment to Shopping Center Lease dated August 14, 2019, and the Third Amendment to Shopping Center Lease dated August 31, 2020 (collectively, the "Lease"). Relevant portions of the Lease and amendments thereto are annexed to this Declaration as Exhibit A.[4]

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

[3] The Star is the 91-acre campus of the Dallas Cowboys World Headquarters and practice facility in Frisco, Texas. Developed as a first-of-its-kind partnership between the City of Frisco and Frisco Independent School District ("Frisco ISD"), The Star gives fans the opportunity to connect with the Dallas Cowboys in ways they have never imagined. Among the world class facilities at The Star are:  (a) the Baylor Scott and White Health Center, a game-changing sports performance and healthcare destination focused on safety and research; (b) the Ford Center, a state-of-the-art, 510,000 square foot indoor athletic facility shared by the Dallas Cowboys, the City of Frisco, and Frisco ISD's high schools; (c) the Tostitos Championship Plaza, which serves as the heartbeat of The Star campus – it is the destination connecting fans with the Dallas Cowboys, creating memories for a lifetime; (d) the Dallas Cowboys Ring of Honor Walk Presented by Dr Pepper®, inspired by the Ring of Honor at AT&T Stadium, the area honors the 22 members of the Dallas Cowboys Football Club who have made outstanding contributions throughout the team's history; and (e) the High School Football Tribute Presented by the Texas Lottery Commission, commemorating their partnership with the Frisco ISD, the Dallas Cowboys alongside the Texas Lottery Commission created a High School Football tribute located at the front entrance of Ford Center.  Each of these world class venues contributes to the unique opportunity guests are treated to at The Star.

[4] Section 28.1 of the Lease provides that the "Tenant agrees to keep the terms and provisions of this Lease strictly confidential."  Consistent with such confidentiality requirement in the Lease, only those relevant portions of the Lease are annexed hereto.

5.       On March 18, 2021, the Landlord sent a *Notice of Default* (the "Default Notice")
to the Debtor for failure to pay Rent as required under the Lease.[5]  The Notice of Default provided
the Debtor ten days to pay all unpaid obligations to the Landlord, pursuant to section 19.1(1) of
the Lease.   On March 30, 2021, Landlord sent the Debtor an *Event of Default* (the "Event of
Default") following the Debtor's failure to pay any of the amounts outstanding to the Landlord as
set forth and required by the Default Notice.  Copies of the Default Notice and Event of Default
are hereto as Exhibits B and C, respectively.  As of the Petition Date, the Debtor was at least
$153,026 in arrears under the terms of the Lease.

6.       On April 5, 2021, I spoke with Melanie J. Cogburn, the Debtor's attorney,
following the Debtor's receipt of both the Notice of Default and the Event of Default, and the
Debtor's failure to timely cure in accordance with the Default Notice on behalf of the Landlord.  I
conveyed to Ms. Cogburn that the Landlord was willing to provide the Debtor a reasonable
opportunity to vacate the premises following the Debtor's failure to pay amounts outstanding to
the Landlord and termination of the Lease.  In this regard, I conveyed the Landlord's request that
the Debtor provide a reasonable timetable for the Debtor to *get its affairs in order* as well as an
outside date by which the Debtor would vacate the premises.  Ms. Cogburn inquired whether any
new agreement or accommodation could be reached to allow the Debtor to use the premises
notwithstanding the termination of the Lease.  I made clear to Ms. Cogburn that the Landlord
declined to enter into any new agreement to allow the Debtor to retain possession of the leased
premises beyond the time reasonably required for the Debtor to remove its property due to the

---

[5] The Default Notice sent on March 18, 2021 was not the first default notice issued by the Landlord to the Debtor, but
was the most recent in a series of default notices provided over the life of the Lease.  Rather, the Debtor defaulted
under the Lease several times because, for example, of failures to pay rent on time, as set forth in the November 8,
2019 and July 22, 2020 Default Notices, and for permitting objectionable noises to emanate from the premises,
disturbing neighbors and residents, as set forth in the November 21, 2020 Default Notice.  In addition, the Debtor
caused a mechanic's lien to be recorded by a contractor (which is a default under section 19.1(7) of the Lease).  *See*
Exhibit D hereto.

Debtor's inability to pay rent under the Lease and the Debtor's numerous violations for failure to operate its business in compliance with the terms of the Lease and applicable law (discussed below).  I unambiguously informed Ms. Cogburn on behalf of the Landlord that the Landlord desired that the Debtor vacate the leased premises, and there was clearly no misunderstanding on Ms. Cogburn's part.

7.      At no time did Landlord receive any payments from the Debtor with respect to Section 21 of the Lease, the provision of the Lease regarding holdover tenants.

8.      Furthermore, based on information provided to it to date, or information the Landlord otherwise obtained, the Landlord understands that the Debtor is party to an approximate $1.9 million secured loan though the United States Small Business Administration, as well as other secured indebtedness, as evidenced by Uniform Commercial Code Financing Statement filings with the Texas Secretary of State.  *See* Exhibit E.

9.      For all the foregoing reasons, I respectfully request that the Court grant the relief requested in the Motion.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed this 20th day of April, 2021.

                                                            *Kaleisha Stuart*_____
                                                            Kaleisha Stuart

**EXHIBIT A**

# SHOPPING CENTER LEASE

### THE STAR

### BLUE STAR FRISCO RETAIL L.P.
LANDLORD

and

### Trophy Hospitality LLC
TENANT

October 26, 2016
Date

6.3     Tenant agrees to pay as an additional charge each month for its Proportionate Share of the cost of management of the Shopping Center and the operation and maintenance of the Shopping Center (including, among other costs, all administrative and management fees and those incurred for managing, lighting, heating, air conditioning, water, sewage, painting, cleaning, policing, inspecting, landscaping, repairing, replacing, guarding and protecting the Common Areas and public liability insurance and any dues, expenses, assessments or other costs incurred by Landlord because of Landlord's membership in any property owner's association or assessed against Landlord or the Shopping Center pursuant to the Declaration) which may be incurred by Landlord in its discretion (the "Common Area Maintenance Payment"). Landlord shall make monthly or other periodic charges based upon the estimated annual Common Area Maintenance Payment, payable in advance but subject to adjustment after the end of the year on the basis of the actual cost for such year. Any such periodic charges shall be due and payable within ten (10) business days after delivery of notice thereof. The initial Common Area Maintenance Payment, subject to adjustment as provided herein, shall be the amount set out in Article I, Section 1.1(1).

Landlord may, from time to time, adjust its estimated Controllable Common Area Maintenance Charges (defined below); provided, however, commencing after the end of the second (2nd) full calendar year of the Lease Term, in no event shall Tenant's Proportionate Share of such Controllable Common Area Maintenance Charges increase, on a cumulative basis, by more than five percent (5%) per calendar year, pro-rated for any partial calendar year, as applicable. As used in this Lease, the term "Controllable Common Area Maintenance Charges " means all costs and expenses that may be included under this Section 6.3 for a calendar year in question, other than utilities, taxes, insurance, security charges, snow and ice removal costs and such other costs and expenses beyond the reasonable control of Landlord. Notwithstanding the foregoing, in the event that Tenant exercises any renewal or extension option (including the Renewal Options described on Exhibit "E" attached to this Lease), Tenant's obligations to pay Controllable Common Area Maintenance Charges shall be re-set at the commencement of such renewal or extension period to the actual amount of Tenant's Proportionate Share for the first (1st) year of the applicable renewal term. Commencing with the second (2nd) year of the applicable renewal or extension period, in no event shall Tenant's Proportionate Share of such Controllable Common Area Maintenance Charges increase, on a cumulative basis, by more than five percent (5%) per calendar year, pro-rated for any partial calendar year.

6.4     Notwithstanding anything to the contrary, in any situation in which Tenant is obligated to pay a Proportionate Share of costs and expenses (including with respect to the Common Area Maintenance Payment, Insurance Escrow Payment and Tax Escrow Payment), Landlord may exclude from the gross leasable square footage in the Shopping Center (the "denominator"), any portions of the Shopping Center leased to, or reserved for, kiosks, retail merchandising units, licensees or tenants under leases with terms of less than one year, non-retail users and tenants, and users of spaces which do not front on the Common Area or do not have storefronts or any other space on the first floor of the Shopping Center; provided, however, Landlord shall also deduct from the Common Area costs and expenses, Insurance and Taxes or other applicable payment, as the case may be, all applicable amounts received from such excluded parties. If the Shopping Center shall be part of or shall include a group of buildings or structures collectively owned or managed by Landlord or its affiliates, or shall include any space used for office, medical, dental or other non-retail purposes, Landlord may determine separately and allocate Common Area costs and expenses, Insurance and Taxes and other applicable payments, as the case may be, between such buildings and structures and the parcels on which they are located, and between the retail and non-retail areas of the Shopping Center, in accordance with sound accounting principles, consistently applied, and commercially reasonable management principles, in which event Tenant's Proportionate Share shall be based on the ratio of the square footage of the Demised Premises to the gross leasable square footage of the buildings, structures or areas for which Landlord separately determines such Common Area costs and expenses, Insurance and Taxes and other applicable payments, subject to the adjustments set forth above.

**ARTICLE VII.  Use and Care of Demised Premises.** 7.1  The Demised Premises may be used only for the purposes specified in Article I, Section 1.1(r) above, and for no other purpose or purposes without the prior written consent of Landlord. Without limiting the generality of the foregoing, in no event shall Tenant use the Demised Premises for any of the restricted, prohibited described on Exhibits "F" and "F-1" attached hereto. Tenant shall use in the transaction of business in the Demised Premises the trade name specified in Article I, Section 1.1(e) above and no other trade name without the prior written consent of Landlord. Tenant shall open for business at the Demised Premises for the Permitted Use by the Commencement Date. Thereafter, Tenant shall not at any time leave

26166404v5 70149.003.25

the Demised Premises vacant, but shall in good faith throughout the term of this Lease conduct and carry on in the entire Demised Premises the type of business for which the Demised Premises are leased. Tenant shall operate its business with a full food and beverage menu, attractive displays and in an efficient, high class and reputable manner so as to produce the maximum amount of gross sales from the Demised Premises, and shall keep the Demised Premises open to the public for business with adequate and competent personnel in attendance at least three hundred twenty (320) days per year, from 11:00 a.m. until 2:00 a.m. (collectively, the "Minimum Days and Hours"), except to the extent Tenant may be prohibited from being open for business by applicable law, ordinance or government regulation.

7.2    Tenant shall not, without Landlord's prior written consent, keep anything within the Demised Premises for any purpose which increases the insurance premium cost or invalidates any insurance policy carried on the Demised Premises or of the part of the Shopping Center. Landlord shall promptly notify Tenant in the event Landlord becomes actually aware that the premium related to any of Landlord's insurance policies is likely to substantially increase or any such policy may be invalidated or terminated as a consequence of Tenant's activities. Landlord and Tenant agree to work together in good faith to prevent or mitigate any such premium increase or policy invalidation or termination from occurring; provided, that, Tenant shall pay as additional rental, upon demand of Landlord, any such increased premium cost due to Tenant's use or occupation of the Demised Premises. All property kept, stored or maintained within the Demised Premises by Tenant shall be at Tenant's sole risk.

7.3    Tenant shall not conduct within the Demised Premises any fire, auction or bankruptcy sales or operate within the Demised Premises a "wholesale" or "factory outlet" store, a cooperative store, a "second hand" store, a "surplus" store or a store commonly referred to as "discount house". Tenant shall not advertise that it sells products or services at "discount", "cut-price", or "cut-rate" prices or that Tenant is "going out of business". Tenant shall not permit any objectionable or unpleasant odors or noises to emanate from the Demised Premises, nor place or permit any radio, television, loudspeaker or amplifier on the roof or outside the Demised Premises or where the same can be seen or heard from outside the building or in the Common Area, nor place an antenna, awning or other projection on the exterior of the Demised Premises; nor solicit business or distribute leaflets or other advertising material in the Common Area; nor take any other action which in the exclusive judgment of Landlord would constitute a nuisance or would disturb or endanger other tenants of the Shopping Center or unreasonably interfere with their use of their respective premises, nor do anything which would tend to injure the reputation of the Shopping Center. Landlord acknowledges and agrees that the description of the Permitted Use as described in Section 1.1(r) appears to be is in compliance with this Section 7.3.

7.4    Tenant shall take good care of the Demised Premises and keep the same free from waste at all times. Tenant shall keep the Demised Premises and sidewalks, service-ways and loading areas adjacent to the Demised Premises neat, clean and free from dirt, rubbish, insects and pests at all times, and shall store all trash and garbage within the Demised Premises, arranging for the removal (from the Demised Premises) and storage of all such trash and garbage in the main holding room of the Parking Garage as shown on the Site Plan attached as **Exhibit "A"** or within any other area designated by Landlord from time to time. Tenant will store all trash and garbage within the area designated by Landlord for such trash pickup and removal and only in receptacles of the size, design and color from time to time provided by Landlord (for the account of Tenant). Receipt and delivery of goods and merchandise and removal of garbage and trash shall be made only in the manner and areas from time to time prescribed by Landlord. Initially, Landlord shall arrange for collection of all trash and garbage and Tenant's Proportionate Share of the cost thereof will be billed as part of its Common Area Maintenance Payment or at Landlord's option be billed separately to Tenant. Landlord may at any time discontinue trash pickup and removal service, in which case Tenant shall arrange for the regular pick up and removal of its own trash and garbage at Tenant's sole cost and expense. Tenant shall not operate an incinerator or burn trash or garbage within the Shopping Center.

7.5    Tenant shall maintain all display windows in a neat, attractive condition, and shall keep all display windows and exterior electric signs in front of the Demised Premises lighted from dusk until 10:00 p.m. every day, including Sundays and holidays.

26166404v5 70149.003.25

7.6     Tenant shall include the address and identity of its business activities in the Demised Premises in all advertisements made by Tenant in which the address and identity of any similar local business activity of Tenant is mentioned.

7.7     Tenant shall procure, at its sole expense, any permits and licenses required for the transaction of business in the Demised Premises. Tenant shall comply with the Declaration and all laws, ordinances, orders, rules and regulations of state, federal, municipal or other agencies or bodies having jurisdiction relating to the use, condition and occupancy of the Demised Premises, including, without limitation, the Americans with Disabilities Act of 1990, as amended from time to time, and the rules and regulations promulgated thereunder now and from time to time hereafter. Tenant shall indemnify, protect, defend and hold Landlord harmless from and against any and all loss, cost (including all repair, remodeling and replacement costs), claim, liability, damage or expense (including attorneys' fees) incurred by or asserted against Landlord as a result of Tenant's failure to comply with such laws, ordinances, orders, rules and regulations. Tenant will comply with the rules of the building adopted by Landlord. Landlord shall have the right at all times to change and amend the rules and regulations of the building or to amend them in any reasonable manner as may be deemed advisable for the safety, care and cleanliness, and for the preservation of good order, of the Shopping Center. Except in a de minimus manner, in no event shall any such change or amendment to the rules and regulations of the building conflict with the Permitted Use. Upon any amendment or change thereto, the rules and regulation of the building shall be sent by Landlord to Tenant in writing and shall thereafter be carried out and observed by Tenant.

7.8     Subject to Landlord's prior written approval as to the design, layout and all other aspects of the Outdoor Patio Area, and subject to Tenant's compliance with all applicable laws, codes, ordinances, title exceptions, and the restricted, prohibited and exclusive uses described on **Exhibits "F" and "F-1"** attached to this Lease and Tenant's receipt of all applicable and necessary governmental approvals, Tenant shall have the right, at Tenant's sole cost and expense, to construct an **"Outdoor Patio Area"** (herein so called) directly outside of the Demised Premises as shown on **Exhibit "A-1"** attached to this Lease and incorporated into this Lease by reference, to place Landlord-approved tables, chairs, trash receptacles, plants and other Landlord-approved items and use the same for the Permitted Use; provided, that there is no interference in the Common Areas (including with respect to pedestrian traffic flow on the sidewalk or parking in the Shopping Center). Tenant agrees not to cook and/or prepare any food or beverages within the Outdoor Patio Area; however, Tenant may serve food and beverages in the Outdoor Patio Area. Tenant is fully responsible for any and all items placed within the Outdoor Patio Area. The Outdoor Patio Area shall be considered to be a part of the Demised Premises for all purposes under this Lease (other than the payment of the Monthly Payment) and thus subject to all of the same obligations as Tenant has with respect to the Demised Premises (including, without limitation, maintaining the Outdoor Patio Area in a clean, neat, orderly and high class manner and insuring such Outdoor Patio Area in the same manner as the Demised Premises as provided in Article XIII of this Lease). In the event Tenant fails to maintain such Outdoor Patio Area as required herein, Landlord shall have the right, upon notice to Tenant (except in the event of an emergency, in which no such prior notice shall be required), to perform the same, and any charges incurred by Landlord will be billed to Tenant and payable to Landlord with a ten percent (10%) administrative fee, which amount shall be due and payable within ten (10) days after Landlord provides Tenant with notice of such billed amount, or, if such day is not a business day, the next following business day.

**ARTICLE VIII. Maintenance and Repair of Demised Premises.** 8.1 Landlord shall keep the foundation, the exterior walls (except store fronts, plate glass windows, doors, door closure devices, window and door frames, molding, locks and hardware and painting or other treatment of interior and exterior walls) and roof (excepting any leaks caused by Tenant, its contractors, employees, or agents) of the Demised Premises in good repair, except that Landlord shall not be required to make any repairs occasioned by the act or negligence of Tenant, its employees, agents, contractors, subtenants, licensees and concessionaires, which repairs shall be made by or on behalf of Tenant, at Tenant's sole cost and expense; provided, however, that any repairs to the roof shall be made in accordance with Section 9.3. In the event that the Demised Premises should become in need of repairs required to be made by Landlord hereunder, Tenant shall give prompt written notice thereof to Landlord and Landlord shall not be responsible in any way for failure to make any such repairs until a commercially reasonable time shall have elapsed after delivery of such written notice. Landlord's obligation hereunder is limited to repairs specified in this Article VIII, Section 8.1, Article XV and any repairs directly caused by the negligence or wilful misconduct of Landlord,

26166404v5 70149.003.25

and Landlord shall have no liability for any damages or injury arising out of any condition or occurrence causing a need for such repairs.

8.2     Tenant shall furnish, maintain and replace all electric light bulbs, tubes and tube casings.

8.3     Tenant shall keep the Demised Premises in good, clean condition and shall, at its sole cost and expense, make all needed repairs and replacements, including replacement of cracked or broken glass, except for repairs and replacements required to be made by Landlord under the provisions of Article VIII, Section 8.1 and Article XV and shall keep all plumbing units, pipes and connections free from obstruction and protected against ice and freezing. If any repairs required to be made by Tenant hereunder are not made within a commercially reasonable time after written notice is delivered to Tenant by Landlord, Landlord may, at its option, make such repairs without liability to Tenant for any loss or damage which may result to its stock or business by reason of such repairs, and Tenant shall pay to Landlord immediately upon demand as additional rental hereunder the cost of such repairs plus ten percent (10%) of the amount thereof. At the expiration of this Lease, Tenant shall surrender the Demised Premises in good condition, reasonable wear and tear and loss by fire or other casualty excepted and shall surrender all keys for the Demised Premises to Landlord and shall inform Landlord of all combinations on locks, safes and vaults, if any, in the Demised Premises.

8.4     Installation, maintenance, repair and replacement (if applicable) of the air conditioning and heating equipment (the "HVAC System") shall be Tenant's sole responsibility throughout the entire term of the Lease. Tenant will also carry insurance covering said equipment and will provide proof of insurance satisfactory to Landlord on said equipment upon occupancy. In this regard, Tenant shall maintain an HVAC maintenance agreement with a reputable contractor to provide for regular maintenance of the HVAC System.

**ARTICLE IX. Alterations.** 9.1 Other than pursuant to Section 3.1 hereof, Tenant shall not make any alterations, additions or improvements to the Demised Premises without the prior written consent of Landlord, except for the installation of unattached, movable trade fixtures which may be installed without drilling, cutting or otherwise defacing the Demised Premises. All alterations, additions, improvements and fixtures (other than unattached, movable trade fixtures, subject to Section 20.1 of this Lease) which may be made or installed by either party upon the Demised Premises shall remain upon and be surrendered with the Demised Premises and become the property of Landlord at the termination of this Lease, unless Landlord requests their removal in which event Tenant shall remove the same and restore the applicable portion of the Demised Premises to substantially its original condition at Tenant's expense. Any linoleum, carpeting, or other floor covering which shall be cemented or otherwise affixed to the floor of the Demised Premises is a permanent fixture and shall become the property of Landlord without credit or compensation to Tenant. Landlord reserves the right to review and approve any and all proposed plans and specifications with respect to any alterations, additions, or improvements to the Demised Premises, including without limitation, in the event a permit is required in connection with any such alteration, addition or improvement, the right to employ architects and engineers, at Tenant's sole expense (which expense must be commercially reasonable), to perform such review.

9.2     All construction work done by Tenant within the Demised Premises shall be performed in a good and workmanlike manner, in compliance with all federal, state, municipal or local laws, ordinances, orders, rules, regulations and requirements, including, without limitation, the Americans with Disabilities Act of 1990, as amended from time to time, and the rules and regulations promulgated thereunder now and from time to time hereafter and in such manner as to cause a minimum of interference with other construction in progress and with the transaction of business in the Shopping Center. Tenant agrees to indemnify Landlord and hold it harmless against any loss, liability, or damage resulting from such work, and Tenant shall, if requested by Landlord, furnish a bond or other security satisfactory to Landlord against such loss, liability or damage.

26166404v5 70149.003.25

9.3     Tenant shall not perform any work or alterations of the roof, nor penetrate the roof, without, in each instance, obtaining the prior written consent of Landlord. In the event that Landlord grants such written consent, Tenant agrees that all venting, opening, sealing, waterproofing or any altering of the roof shall be performed by Landlord's roofing contractor at Tenant's expense and that when completed Tenant shall furnish to Landlord a certificate from Landlord's roofing contractor that all such alterations approved by Landlord have been completed in accordance with the plans and specifications therefore approved by Landlord.

9.4     Tenant shall not permit any lien or claim of lien to attach to this Lease, the Demised Premises or to any portion of the Shopping Center as a result of Tenant's or its employees', agents', or contractors' acts or omissions and Tenant shall remove or cause such lien to be removed at Tenant's sole cost and expense. In the event Tenant fails to promptly remove any such lien or claims of lien, Landlord may, but shall not be obligated to, cause such lien to be removed at Tenant's sole cost and expense. Any such cost or expense incurred by Landlord in removing any such lien or claim of lien shall be deemed to be additional rental hereunder and shall be due and payable within ten (10) days after demand by Landlord, together with interest thereon from the date incurred by Landlord through the date of payment by Tenant at an interest rate equal to the lesser of (a) the maximum rate permitted by then applicable law, or (b) twelve percent (12%) per annum.

**ARTICLE X. Landlord's Right of Access; Use of Roof.**  10.1 Landlord shall have the right to enter upon the Demised Premises upon reasonable, prior written notice to Tenant, at any reasonable time for the purpose of inspecting the same, or making repairs to the Demised Premises, or making repairs, alterations or additions to adjacent premises, or, not earlier than six (6) months prior to the end of the Lease Term, showing the Demised Premises to prospective purchasers, lessees or lenders. Further, Landlord shall have the right to enter upon the Demised Premises at any time in the event of an emergency without liability for any damage caused to the Demised Premises or Tenant's property upon such entry.

10.2     Unless otherwise agreed by and between Landlord and Tenant in writing, use of the roof above the Demised Premises is reserved to Landlord.

**ARTICLE XI. Signs; Store Fronts.**  11.1 Tenant shall not, without Landlord's prior written consent, (a) make any changes to or paint the store front; or (b) install any exterior lighting, decorations or paintings; or (c) affix signs, advertisements, banners, or other material to the outside of store windows nor to the outside of any doors, columns or storefront walls. All interior signage must be tastefully and professionally done and the use of handscribed signs of any kind is expressly prohibited. In addition, any such interior signage that is visible from the exterior of the Demised Premises shall be subject to the prior written consent of Landlord. Landlord reserves the right to remove unauthorized signage at Tenant's sole cost and expense after reasonable, prior written notice to Tenant. All signs, decorations, and advertising media shall conform in all respects to the terms and provisions of the Declaration and the reasonable sign criteria established by Landlord for the Shopping Center from time to time in the exercise of its sole discretion ("Sign Criteria") (which initial Sign Criteria is attached to this Lease as **Exhibit "D"**) and shall be subject to the prior written approval of Landlord as to construction, method of attachment, size, shape, height, lighting, color, and general appearance. All signs pertaining to the Demised Premises shall, at Tenant's sole cost, be kept in good condition and in proper operating order at all times. Landlord reserves the right to designate a uniform type of sign for the Shopping Center to be installed, removed or paid for by Tenant, but if required after Tenant's Work is completed and Tenant's then-existing signs must be replaced at the direction of Landlord as a direct result thereof, then Landlord shall pay for the actual and reasonable costs incurred by Tenant in connection with such required changes to such signage (but only if and to the extent such existing signs were previously approved by Landlord).

11.2     Tenant agrees to have erected and/or installed and fully operative on or before the Commencement Date of this Lease all signs in accordance with the Sign Criteria. Tenant, upon vacation of the Demised Premises, or the removal or alteration of its sign for any reason, shall be responsible for the repair, painting, and/or replacement of the building fascia surface where the sign is attached.

26166404v5 70149.003.25

18.4      (a) If at any time during the term of this Lease, the present method of taxation shall be changed so that in lieu of, or in addition to, the whole or any part of any taxes, assessments, levies, assessed or imposed on real estate and the improvements thereon, there shall be levied, assessed, or imposed on Landlord a capital levy or other tax directly on the rents received therefrom and/or a franchise tax, margin tax, assessment levy or charge measured by or based, in whole or in part, upon such rents on the present or any future building or buildings on the Shopping Center, Landlord shall immediately notify Tenant thereof and then all such taxes, assessments, levies or charges, or the part thereof so measured or based, shall be deemed to be included within the term "Taxes" for the purpose hereof.

(b) Any payment to be made pursuant to this Article XVIII with respect to the real estate tax year in which this Lease commences or terminates shall bear the same ratio to the payment which would be required to be made for the full tax year as that part of such tax year covered by the term of this Lease bears to a full tax year.

18.5      Tenant acknowledges that Landlord may receive certain sales tax rebates, property tax abatements, property tax rebates, reductions or limits in the assessed valuation of the Shopping Center, and other tax incentives (collectively, the "Tax Rebates") pursuant to certain agreements now or hereafter in effect with respect to the Shopping Center (collectively, and as the same may be amended, modified, extended and/or replaced from time to time, the "Tax Agreements"). Notwithstanding anything to the contrary, Tenant disclaims any interest in such Tax Rebates. In addition, Tenant agrees to comply with all reasonable requests by Landlord in connection with the Tax Agreements, including, without limitation, Tenant's compliance with the sales tax reporting requirements under Section 5.1 of this Lease.

**ARTICLE XIX. Default by Tenant and Remedies.** 19.1 The following events shall be deemed to be "Events of Default" by Tenant under this Lease:

(1)      Tenant shall fail to pay any amount due to Landlord as herein provided and such failure shall continue for a period of ten (10) days after written notice of such default; provided, however, that Landlord shall not be required to provide more than two (2) notices per calendar year in respect of any regular Monthly Payment (i.e., after such notice is provided, it shall be an automatic Event of Default if Tenant fails to make another regular Monthly Payment when due during such calendar year).

(2)      Except as otherwise provided in subsection (1) above or subsections (3) through (15) below, Tenant shall fail to comply with any term, provision or covenant of this Lease, and shall not cure such failure within thirty (30) days after written notice thereof to Tenant; provided, however, if such default is not capable of cure within such period, Tenant shall have commenced such cure within such thirty (30) day period and thereafter diligently proceed to completion within an additional sixty (60) days.

(3)      Tenant or any guarantor of Tenant's obligation under this Lease shall become insolvent, or shall make a transfer in fraud of creditors, or shall make an assignment for the benefit of creditors.

(4)      Tenant or any guarantor of Tenant's obligation under this Lease shall file a petition under any section or chapter of the Bankruptcy Act, as amended, or under any similar law or statute of the United States or any State thereof, or Tenant or any guarantor of Tenant's obligations under this Lease shall be adjudged bankrupt or insolvent in proceedings filed against Tenant or any guarantor of Tenant's obligation under this Lease.

(5)      A receiver or trustee shall be appointed for the Demised Premises or for all or substantially all of the assets of Tenant or any guarantor of Tenant's obligation under this Lease.

(6)      Tenant shall desert or vacate any portion of the Demised Premises.

(7)     Tenant shall do or permit to be done anything that creates a lien or claim of lien to attach to this Lease, the Demised Premises or to any portion of the Shopping Center.

(8)     The business operated by Tenant shall be closed for failure to pay any State sales tax as required or for any other reason, except as otherwise expressly permitted herein.

(9)     Tenant shall assign this Lease or sublet the Demised Premises in violation of Article XVII.

(10)    The Demised Premises shall be used for purposes other than those listed in Section 1.1(r).

(11)    Tenant shall use or display signs other than those approved in accordance with Article XI.

(12)    There shall be an anticipatory breach of this Lease by Tenant. The term "anticipatory breach" means either (a) Tenant's repudiation of this Lease in writing, or (b) the combination of (i) Tenant's desertion or vacation or commencement of desertion or vacation of the Demised Premises or removal of all or a substantial amount of Tenant's goods, wares, equipment, fixtures, furniture, or other personal property from the Demised Premises, and (ii) Tenant's failure to pay any Minimum Guaranteed Rental or other amounts due under this Lease as and when they are due and payable after notice by Landlord pursuant to (1) above.

(13)    Tenant breaches the terms and provisions of Article XXVI

(14)    Tenant shall fail to comply with any of subsections (3), (4) and/or subsection (5) of Article XXIX, as applicable, and Tenant does not cure such failure within five (5) days after receipt of written notice thereof from Landlord.

(15)    Tenant shall fail to comply with any of subsections (3), (4) and/or subsection (5) of Article XXIX on more than one (1) occasion during any calendar year, the second (2nd) such violation within such calendar year (and any subsequent violation within such calendar year) shall be deemed an automatic Event of Default by Tenant under this Lease.

Upon the occurrence of any Event of Default, Landlord shall have the option to pursue any one or more of the following remedies, or any other remedy set forth in this Lease or otherwise permitted by law or in equity without further notice or demand whatsoever:

A.     Terminate this Lease in which event Tenant shall surrender the Demised Premises to Landlord immediately upon receipt of notice by Landlord that Landlord has terminated this Lease. In the event that Tenant fails to do so, Landlord may, without prejudice to any other remedy which it may have for possession or arrearages in rental enter upon, take possession of the Demised Premises, expel or remove Tenant and any other person who may be occupying said premises or any part thereof, by force if necessary, without being liable for prosecution or any claim of damages therefor.

B.     Enter upon and take possession of the Demised Premises and expel or remove Tenant and any other person who may be occupying said premises or any part thereof, by force if necessary, without being liable for prosecution or any claim for damages therefor with or without having terminated the Lease.

C.     Enter upon the Demised Premises by force if necessary without being liable for prosecution or any claim for damages therefor, and do whatever Tenant is obligated to do under the terms of this Lease, and Tenant agrees to reimburse Landlord on demand for any expense which Landlord may incur in thus effecting compliance with Tenant's obligations under this Lease, and Tenant further agrees that Landlord shall not be liable for any damages resulting to Tenant from such action. Any sum due shall accrue interest from the date due to Landlord until paid by Tenant, with such interest

26166404v5 70149.003.25

to be at the lesser of (a) the maximum legal rate permitted by then applicable law, or (b) twelve percent (12%) per annum and such sums to be paid to Landlord.

D. Alter all locks and other security devices at the Demised Premises without terminating this Lease and without providing any notice (statutory or otherwise) regarding the same.

E. Upon the occurrence of an Event of Default pursuant to Article XXVI (i), the Minimum Guaranteed Rental payable by Tenant under this Lease shall be increased to an amount equal to one hundred fifty percent (150%) of the amount stipulated in this Lease, which higher amount shall continue to be payable during the entire period of such Event of Default, and (ii) the Percentage Rental shall be computed as if the "Gross Sales" from the Demised Premises were one hundred fifty percent (150%) of the actual Gross Sales required to be reported to Landlord under the terms of this Lease during the entire period of such Event of Default.

19.2 Except as otherwise expressly set forth in this Lease, exercise by Landlord of any one or more remedies hereunder granted or otherwise available shall not be deemed to be an acceptance of surrender of the Demised Premises by Tenant, whether by agreement or by operation of law, it being understood that such surrender can be effected only by the written agreement of Landlord and Tenant. No such alteration of locks or other security devices and no removal or other exercise of dominion by Landlord over the property of Tenant or others at the Demised Premises shall be deemed unauthorized or constitute a conversion, Tenant hereby consenting, after any Event of Default, to the aforesaid exercise of dominion over Tenant's property within the Demised Premises. All claims for damages with respect to Landlord's exercise of any remedy are hereby waived, as are all claims for damages by reason of any distress warrant, forcible detainer proceedings, sequestration proceedings or other legal process. Tenant agrees that any re-entry by Landlord may be pursuant to judgment obtained in forcible detainer proceedings or other legal proceedings or without the necessity for any legal proceedings, as Landlord may elect, and Landlord shall not be liable in trespass or otherwise in connection with Landlord's exercise of its remedies.

19.3 In the event Landlord elects to terminate this Lease by reason of an Event of Default, then notwithstanding such termination, Tenant shall be liable for and shall pay to Landlord, at the address specified for notice to Landlord herein the sum of all rental and other amounts accrued through the date of such termination, plus, as damages an amount equal to the difference between (1) the total rental (Minimum Guaranteed Rental and Percentage Rental) plus Tenant's Common Area Maintenance Payment, Insurance Escrow Payment, Marketing Fund Charge and Tax Escrow Payment and all other amounts due and payable hereunder for the remaining portion of the Lease Term (had such Lease Term not been terminated by Landlord) less (2) the then present value of the then fair rental value of the then Demised Premises for such period. It is agreed by the parties that the actual damages which might be sustained by Landlord by reason of Tenant's failure to pay when due Monthly Payments are uncertain and difficult to ascertain, and it is further agreed that such sums, calculated as set forth above, would be reasonable and just compensation for such failure and Tenant hereby promises to pay Landlord such sums as liquidated damages and not as a penalty in the event of such breach (however, the same shall be in addition to, and not in lieu of, Landlord's other rights and remedies available under this Lease, at law or in equity).

19.4 In the event that Landlord elects to repossess the Demised Premises without terminating the Lease, then Tenant shall be liable for and pay to Landlord at the address specified for notice to Landlord herein all rental and other amounts accrued to the date of such repossession, plus rental required to be paid by Tenant to Landlord during the remainder of the Lease Term until the date of expiration of the term as set forth in Article I less any net sums thereafter received by Landlord through reletting the Demised Premises during said period (after deducting expenses incurred by Landlord as provided in Article XIX, Section 19.5 hereof). In no event shall Tenant be entitled to any excess of any rental obtained by reletting over and above the rental herein reserved. Actions to collect amounts due by Tenant to Landlord as provided in this Article XIX, Section 19.4 may be brought from time to time, on one or more occasions, without the necessity of Landlord's waiting until expiration of the Lease Term.

     26166404v5 70149.003.25

19.5     In case of any Event of Default or breach by Tenant, Tenant shall also be liable for and shall pay to Landlord, at the address specified for notice to Landlord herein, in addition to any sum provided to be paid above, broker's fees incurred by Landlord in connection with reletting the whole or any part of the Demised Premises; the costs of removing and storing Tenant's or other occupant's property; the costs of repairing, altering, remodeling, or otherwise putting the Demised Premises into condition acceptable to a new tenant or tenants, and all reasonable expenses incurred by Landlord in enforcing or defending Landlord's rights and/or remedies including reasonable attorney's fees.

19.6     In the event of termination or repossession of the Demised Premises after an Event of Default, Landlord shall not have any obligation to relet or attempt to relet the Demised Premises, or any portion thereof, or to collect rental after reletting, and in the event of reletting, Landlord may relet the whole or any portion of the Demised Premises for any period, to any tenant, and for any use and purpose and on such terms as may be acceptable to Landlord in its sole discretion. Landlord shall owe no duty or obligation to Tenant if Landlord attempts to relet the Demised Premises or attempts in any way to mitigate Landlord's damages in the event of termination or repossession of the Demised Premises after an Event of Default.

19.7     If Tenant should fail to make any payment or cure any default hereunder within the time herein permitted, Landlord, without being under any obligation to do so and without thereby waiving such default, may make such payment or remedy such other default for the account of Tenant (and enter the Demised Premises for such purpose), and thereupon Tenant shall be obligated to, and hereby agrees, to pay Landlord, upon demand, all costs, expenses and disbursements (including reasonable attorney's fees) incurred by Landlord in taking such remedial action. All rental amounts (including Percentage Rental) and any other charges and expenses to be paid by Tenant to Landlord hereunder which are not paid when due shall bear interest at the lesser of (a) the maximum interest rate permitted by then applicable law, or (b) twelve percent (12%) per annum, and such interest charge shall accrue from the date payment is due until the date paid.

19.8     Tenant acknowledges its obligation to deposit with Landlord the sum stated in Section 1.1(p) above, to be held by Landlord without interest as security for the performance by Tenant of Tenant's covenants and obligations under this Lease. Tenant agrees that such deposit may be co-mingled with Landlord's other funds and is not an advance payment of rent or a measure of Landlord's damages in case of default by Tenant. Upon the occurrence of any Event of Default by Tenant, Landlord may, from time to time, without prejudice to any other remedy provided in this Lease or provided by law, use such amount to the extent necessary to make good any arrears of rent and any other damage, injury, expense or liability caused to Landlord by such Event of Default, and Tenant shall pay to Landlord on demand the amount so applied in order to restore the security deposit to its original amount. If Tenant is not then in default under this Lease, any remaining balance of such deposit shall be returned by Landlord to Tenant within thirty (30) days after termination of this Lease (subject to the provisions of Section 28.12 below).

19.9     In the event of any default by Landlord, Tenant's exclusive remedy shall be an action for damages (Tenant hereby waiving the benefit of any laws granting it a lien upon the property of Landlord and/or upon rent due Landlord), but prior to any such action Tenant will give Landlord written notice specifying such default with particularity, and Landlord shall thereupon have thirty (30) days; provided, however, if such default is not capable of cure within such period, Landlord shall have commenced such cure within such thirty (30) day period and thereafter proceed diligently to completion within an additional sixty (60) days. Tenant acknowledges and agrees that Tenant has experience in financial and business matters that enables Tenant to analyze the merits and risks of the transactions contemplated hereby and that Tenant is not in a disparate bargaining position with respect to Landlord. Except as otherwise provided hereunder, Tenant hereby knowingly, voluntarily and intentionally waives and releases any and all rights, benefits and remedies Tenant may have against Landlord, now or at any time hereafter, to seek or otherwise obtain any consequential, special, punitive, exemplary or other similar damages and Tenant hereby waives any right to seek payment or reimbursement of such damages from Landlord. All obligations of Landlord hereunder will be construed as covenants, not conditions; and all such obligations will be binding upon Landlord only during the period of its ownership and possession of the Shopping Center and not thereafter.

26166404v5 70149.003.25

The term "Landlord" shall mean only the owner, for the time being of the Shopping Center, and in the event of the transfer by such owner of its interest in the Shopping Center, except as otherwise provided hereunder, such owner shall thereupon be released and discharged from all covenants and obligations of Landlord thereafter accruing, but such covenants and obligations shall be binding during the Lease Term upon each new owner from the duration of such owner's ownership.

Notwithstanding any other provision hereof, all liability hereunder shall be non-recourse to Landlord. In the event of any breach or default by Landlord in any term or provision of this Lease beyond applicable notice and cure periods, Tenant agrees to look solely at the equity or interest then owned by Landlord in the land and improvements which constitute the Shopping Center; however, in no event, shall any deficiency judgment or any money judgment of any kind be sought or obtained against Landlord.

19.10   Tenant shall pay any Percentage Rental due and unpaid from the last payment of Percentage Rental through the date of termination and shall provide Landlord a statement accurately showing Gross Sales from which such payment(s) or Percentage Rental was calculated, together with such additional supporting financial records as Landlord may require. For any period after termination of this Lease or termination of Tenant's right to possession of the Demised Premises without a termination of this Lease, for the purpose of computing the amount of Tenant's liability under this Article XIX for Percentage Rental after termination of this Lease or possession as applciable, the periodic Percentage Rental for which Tenant shall be liable after termination of Tenant's right to possession shall be, without duplication, the total of all amounts Tenant was obligated to pay as Percentage Rental during the entire period before such termination divided by the number of Percentage Rental payment periods in such entire time. The provisions of this Article XIX, Section 19.10 relating to Percentage Rental, if any, payable by Tenant hereunder are included solely for the purpose of providing for the payment of rental in excess of the Minimum Guaranteed Rental, and providing for a method whereby such additional rental is to be measured, ascertained and paid, and shall be cumulative with and not in limitation of all other remedies provided for Landlord herein.

19.11   In the event that Landlord shall have taken possession of the Demised Premises pursuant to the authority herein granted and Tenant owes Landlord any amount hereunder, then Landlord shall have the right to keep in place and use all the furniture, fixtures and equipment at the Demised Premises to the extent of such amounts owed by Tenant to Landlord hereunder, including that which is owned by or leased to Tenant at all times prior to any foreclosure thereon by Landlord or repossession thereof by a lessor thereof or third party having a lien thereon and place same in storage at any premises within the County in which the Demised Premises is located; and in such event, Tenant shall be liable to Landlord for costs incurred by Landlord in connection with such removal and storage. Landlord shall have the right to relinquish possession of all or any portion of such furniture, fixtures, equipment and other property to any person ("Claimant") claiming to be entitled to possession thereof who presents to Landlord a copy of any instrument represented to Landlord by Claimant to have been executed by Tenant (or any predecessor of Tenant) granting Claimant the right under various circumstances to take possession of such furniture, fixtures, equipment or other property, without the necessity on the part of Landlord to inquire into the authenticity of said instrument's copy of Tenant's or Tenant's predecessor's signature thereon and without the necessity of Landlord's making any nature of investigation or inquiry as to the validity of the factual or legal basis upon which Claimant purports to act and Tenant agrees to indemnify and hold Landlord harmless from all costs, expense, loss, damage and liability incident to Landlord's relinquishment of possession of all or any portion of such furniture, fixtures, equipment or other property to Claimant. The rights of Landlord herein stated shall be in addition to any and all other rights which Landlord has or may hereinafter have at law or in equity; and Tenant stipulates and agrees that the rights herein granted Landlord are commercially reasonable.

**ARTICLE XX.   Landlord's Lien.** To secure the payment of all rental and other sums of money due and to become due hereunder and the faithful performance of this Lease by Tenant and to the extent owned by Tenant and not subject to a lien in favor of a bona fide third party providing financing with respect to Tenant's business operations at the Demised Premises, Tenant hereby gives to Landlord an express first and prior contract lien and security interest on Tenant's interest in all property (including furniture, fixtures, equipment, inventory, chattels and merchandise and all accessories thereto and all proceeds thereof) which may be placed in the Demised Premises, and also upon all proceeds of any insurance which may accrue to Tenant by reason of destruction of or damage to any such property. Such property shall not be removed therefrom without the written consent of Landlord until all arrearages in rental

26166404v5 70149.003.25

and other sums of money then due to Landlord hereunder shall first have been paid. All exemption laws are hereby waived in respect of said lien and security interest. This lien and security interest is given in addition to Landlord's statutory lien and shall be in addition thereto. Upon the occurrence of an Event of Default, this lien may be foreclosed with or without court proceedings by public or private sale, provided Landlord gives Tenant at least fifteen (15) days' prior notice of the time and place of sale, and Landlord shall have the right to become the purchaser, upon being the highest bidder at such sale. Contemporaneous with the execution of this Lease and at any time thereafter throughout the term of this Lease, Landlord may file uniform commercial code financing statements in sufficient form so that when properly filed, the security interest hereby given shall be perfected. If requested hereafter by Landlord, Tenant shall also execute and deliver to Landlord uniform commercial code financing statement change instruments in sufficient form to reflect any proper amendment or modification in or extension of contract lien and security interest. Landlord, in addition to all of its rights hereunder, shall also have all of the rights and remedies of a secured party under the uniform commercial code as adopted in the state in which the Demised Premises is located.

**ARTICLE XXI. Holding Over.** In the event Tenant remains in possession of the Demised Premises after the expiration of this Lease and without the execution of a new lease or any extension or renewal hereof, Tenant shall be deemed occupying the Demised Premises as a tenant at sufferance. In such event Landlord may demand of Tenant for every month Tenant remains in possession one hundred fifty percent (150%) of the greater of (a) the then market rental rate for the Demised Premises, and (b) the Minimum Guaranteed Rental payable by Tenant under the terms of this Lease immediately prior to the expiration hereof, with the resulting tenancy constituting a tenancy at sufferance. Further, Tenant shall defend, indemnify and hold Landlord harmless from and against all claims, losses and liabilities for all costs and damages incurred by Landlord resulting from Tenant's failure to surrender possession of the Demised Premises after the expiration of this Lease or earlier termination of this Lease, and such obligations shall survive the expiration or earlier termination of this Lease.

**ARTICLE XXII. Subordination.** 22.1 Tenant accepts this Lease subject and subordinate to the Declaration and any mortgage, deed of trust or other lien (including any title exceptions) presently existing or hereafter created upon the Demised Premises or Shopping Center, and to any renewals and extensions thereof, but Tenant agrees that any mortgagee, beneficiary or other party shall have the right at any time to subordinate such mortgage, deed of trust or other lien to this Lease. Landlord is hereby irrevocably vested with full power and authority to subordinate this Lease to any mortgage, deed of trust or other lien (including any title exceptions) hereafter placed upon Demised Premises or Shopping Center, and Tenant agrees upon reasonable notice and demand to execute such further instruments subordinating this Lease as Landlord may request. The terms of this Lease may be subject to approval by Landlord's lender(s), and, if so, such approval is a condition precedent to Landlord's obligations hereunder. Upon demand, Tenant agrees to hereafter execute such further instruments subordinating this Lease as Landlord may request and such attornment agreement as Landlord's mortgagee, beneficiary or other party may request. In the event Tenant fails to execute any such instrument within ten (10) days after written request, Tenant hereby irrevocably appoints Landlord as Tenant's agent and attorney-in-fact to execute such instruments in Tenant's name, place and stead, it being stipulated by Landlord and Tenant that such appointment is coupled with an interest and is accordingly irrevocable. Upon any foreclosure of a lien against all or any portion of the Shopping Center in which the Demised Premises are located, or the acceptance of a deed in lieu thereof, Tenant hereby agrees to attorn to the purchaser at any such foreclosure sale or deed in lieu thereof at any time or from time to time thereafter upon the request and at the sole and exclusive option of such purchaser.

22.2     Tenant agrees to furnish copies of any default or similar notices delivered by Tenant to Landlord hereunder at the same time to each holder of a lien, now or at any time and from time to time hereafter, against all or any portion of the Shopping Center, provided that Tenant has been afforded written notice of the name and address of such holder. Each such holder shall have the right (but not the obligation) to cure any default by Landlord within the same time period afforded Landlord to cure any such default.

26166404v5 70149.003.25

upon notification by Landlord of a violation of this Section 28.17, Tenant will immediately cease selling said objectionable merchandise or services identified by Landlord. Landlord acknowledges that description of the Permitted Use does not appear to violate this Section 28.17.

28.18    Tenant shall not for any reason withhold or reduce Tenant's required payments of rent provided in this Lease, it being agreed that the obligations of Landlord under this Lease are independent of Tenant's obligations except as may be otherwise expressly provided. The immediately preceding sentence shall not be deemed to deny Tenant the ability of pursuing all rights granted it under this Lease or at law.

28.19    The time for the performance of all of the covenants, conditions and agreements contained in this Lease is of the essence of this Lease. In the event suit is brought under this Lease, the prevailing party shall be awarded attorneys' fees and costs whether incurred before trial, at trial or on appeal.

28.20    If Tenant is comprised of more than one (1) party, each such party shall be jointly and severally liable for Tenant's obligations under this Lease.

28.21    Tenant agrees to keep the terms and provisions of this Lease strictly confidential.

28.22    Notwithstanding anything to the contrary, all rights of Tenant under this Lease and all obligations of Landlord under this Lease shall in all cases be subject to the Declaration (as the same may be amended, modified or supplemented from time to time) and applicable laws, codes, ordinances, title exceptions, use restrictions (including the restricted, prohibited uses described on **Exhibits "F" and "F-1"** attached to this Lease) and the existing leases and other existing agreements relating to the Shopping Center.

28.23    **Exhibits "A" through "I"** are attached to this Lease and incorporated into this Lease by reference.

**ARTICLE XXIX. Special Provisions.** Notwithstanding anything to the contrary, the following special provisions shall apply to this Lease. To the extent there is any conflict between this Article XXIX and any other provisions of this Lease, this Article XXIX shall control.

(1)    Tenant acknowledges and agrees that bars, taverns, cocktail lounges, nightclubs, wine bars, martini bars, and/or any other establishments serving alcoholic beverages shall be permitted to operate in all areas throughout the Shopping Center and under such terms and conditions as may be determined from time to time by Landlord in Landlord's sole discretion.

(2)    Landlord shall have the right, at any time and from time to time, to close vehicular access in the area designated as the "Special Events Area" as shown on the Site Plan attached as **Exhibit "A"** to this Lease to accommodate various special events, including without limitation, parades, concerts, fairs, festivals, and other such events.

(3)    If and to the extent Tenant sells or offers carbonated soft drink beverages ("CSDs") from the Demised Premises, Tenant shall only sell, serve or offer PepsiCo ("Pepsi") and Dr Pepper Snapple Group ("DPSG") CSDs and offer the same equally (50/50) and purchase such CSDs directly from Pepsi and/or DPSG. By way of example, if a Demised Premises maintains six (6) fountain taps then three (3) must provide Pepsi CSDs (e.g., Pepsi, Diet Pepsi, Mountain Dew) and three (3) must provide DPSG CSDs (e.g., Dr Pepper, Diet Dr Pepper, 7UP). Additionally, if and to the extent Tenant sells or offers (i) bottled/ready-to-drink iced tea beverages (e.g., Lipton) Tenant shall only sell, serve or offer only Pepsi bottled/ready-to-drink iced tea beverages and purchase such products from Pepsi; and (ii) unflavored bottled water (e.g., Deja Blue) Tenant shall only sell, serve or offer only DPSG unflavored bottled water and purchase such products from DPSG. If and to the extent Tenant offers vending machines or is acting as a quick service restaurant, limited serve restaurant and/or fast casual restaurant where a sandwich is the significant menu and sells or offers any hard pretzels, potato chips/crisps, corn chips, cheese puffs, tortilla chips (flavored, unflavored and/or rolled), multigrain chips, pita chips, or packaged popcorn ("Salty Snacks") from the Demised

**Exhibit "D"**

**Sign Criteria**



## TENANT CRITERIA . 04.27.15





26166404v5 70149.003.25

**Retail Tenant Identity Signs**

Each retail space is allowed a specific suite of sign types per location – selected from the following sign categories. The aggregate area of all building mounted tenant identity signage cannot exceed one and a half (1.5) square foot of signage per linear frontage of each façade with storefront.

**Sign Type I - Primary Building Mounted Identity Sign**

*A maximum of one primary identity sign per tenant façade is required per tenant. Should a tenant occupy a corner location or have multiple façades, then the tenant is permitted to have a single identity on each façade, subject to the maximum number of signs allowable per, local codes, and/or the tenant lease agreement.*

A. Fascia sign:
   a. Individual letters pin mounted or flush mounted to architectural façade
   b. Maximum sign area is one and a half (1.5) square foot per linear frontage each façade with storefront
   c. Individual letters cannot exceed 24" in height; if a logo is "stacked" or double line, then the individual letters cannot exceed 18" in height with an overall maximum height of 40"
   d. Signs and letters cannot exceed 6" in depth; all dimensional letters shall have a return or depth in proportion to their size (i.e., a 6" or smaller letter must have a minimum 1" return, the maximum return required shall be 6" for the maximum allowable letter).
   e. Back lit halo-illuminated signs or external illumination (fixture to be approved by Landlord) are permitted, no front face acrylic illumination or box signs permitted unless specific exceptions are made by the Landlord; halo-illuminated signage is preferred, although internally illuminated signs or neon signs may be permitted at the discretion of Land lord depending upon the size and location of the sign. LED lighting is encouraged; all raceways and conduit must be concealed.
   f. Roof mounted parapet signs or signs protruding above the building roof line are not permitted.
   g. Lettering shall consist of individually pin-mounted or flush mounted dimensional letters. Also, dimensional letters located on and supported by an architectural canopy are permitted. Box, panel, or surface electrical raceway-mounted signs are not permitted.
   h. A registered logo and/or logotype may be allowed if submitted and approved by the Land lord. However, the logo must occupy no more than ten (10) percent of the overall Tenant's message area.
   i. Tenant identity sign not to exceed 75% of the width of the storefront or architectural feature that this sign is mounted on.
   j. Corporate colors for the tenant identities are permissible, but only one color can be used for the entire sign/logo; side returns of letters to be the same color as the face of letter

B. Architectural canopy sign (non-canvas awning):
   a. Individual dimensional metals letters mounted above architectural canopy; letters may require additional structural support
   b. Letters cannot exceed 24" in height
   c. Maximum sign area is one and a half (1.5) sf per linear frontage each façade of storefront
   d. Signs and letters cannot exceed 6" in depth

e. Lighting may be:
   i. Backlit halo-illuminated letters with laser cut back plates per individual letter
   ii. Up-lit external illumination or illumination of background architecture
f. Similar guidelines for Fascia Signs apply to Canopy Signs as well

**Sign Type II - Projecting Blade Identity Sign**

*A maximum of one projecting wall mounted blade identity sign per tenant façade is required per retail space. Should a tenant occupy a corner location and have two facades, then the tenant is permitted to have a single projecting blade identity on each façade.*

C. Vertical marquee-style blade sign:
   a. Two sided vertical sign panel mounted to architecture
   b. Letters shall fit comfortably within the sign area - max sign width 3'-0" and max sign height: 12'-0"
   c. Lighting may be:
      i. Backlit halo-illuminated letters
      ii. Internally illuminated push-through acrylic letters with opaque faces
      iii. Up-lit external illumination

D. Pedestrian- scaled projecting blade sign:
   a. Maximum quantity two, one blade sign per 'merchandised' elevation
   b. Letters shall fit comfortably within the sign area - max sign width 36" and max sign height is 24"; blade signs can either be mounted to the storefront or suspended from the tenant's rigid architectural canopy; no blade signs permitted on demising piers between tenants
   c. Internal illumination is required. Lighting may be:
      i. Internally illuminated push-through acrylic letters
      ii. External illumination

**Sign Type III - Secondary Identity Signs**

E. Entry Sign:
   a. Individual dimensional letters mounted directly above tenant entry or adjacent
   b. Individual letters cannot exceed 10" in height
   c. Signs are only to be ambient illuminated

F. Window Graphics:
   a. Laser cut dimensional graphics applied to the first surface of storefront
   b. Color recommendations: White, black, or frosted vinyl to appear as etched
   c. Located in the bottom 20% of the storefront
   d. Individual letters cannot exceed 6" in height
   e. Copy limited to tenant DBA name only

G. Other items in Full Criteria:  Operational signs, Interior Signs, Inlaid Vestibule Floor Signs, "A" Frames, Prohibited Signs, Prohibited Materials, Submittals, Review Process



THE STAR

HOME OF THE DALLAS COWBOYS

26166404v5 70149.003.25

# REFERENCE IMAGES



TENANT SIGNAGE ON CANOPY

TENANT SIGNAGE ON FASCIA

26166404v5 70149.003.25

# REFERENCE IMAGES



**Exhibit "F"**

**Restricted Uses**

No portion of the Demised Premises shall be used for the following uses:

1.      An auditorium, meeting hall, church or other place of public assembly.

2.      A dance hall or ballroom.

3.      A tavern, bar or other facility serving alcoholic beverages, except to the extent such constitutes part of the Permitted Use by Tenant and then only primarily for on-premises consumption.

4.      An off-track betting business.

5.      A billiard or pool hall, except to the extent such constitutes part of the Permitted Use by Tenant

6.      For bingo or similar games of chance.

7.      A massage parlor or tanning salon.

8.      A game arcade or video game room, except to the extent such constitutes part of the Permitted Use by Tenant

9.      A bowling alley, except to the extent such constitutes part of the Permitted Use by Tenant

10.     A skating rink.

11.     Automobiles sales or a car wash, car repair or car rental agency.

12.     A nightclub or discotheque.

13.     An adult book or adult video tape store (which are defined as stores in which any portion of the inventory is not available for sale or rental to children under 18 years old because such inventory explicitly deals with or depicts human sexuality), or any establishment selling or exhibiting pornographic materials.

14.     A "sexually oriented business", which shall mean (i) a sex parlor, nude studio, modeling studio, love parlor, adult bookstore, adult movie theater, adult video arcade, adult movie arcade, adult video store, adult motel, or (ii) a nightclub, bar, restaurant, or similar commercial enterprise that provides live nude or partially nude entertainment or live nude or partially nude performances.

15.     Hotel or other lodging facilities.

16.     Flea market, or any second-hand or surplus store.

17.     Manufacturing facility (other than manufacturing of food items incidental to a restaurant or catering operation).

18.     Any mortuary or funeral establishment.

19.     Pawn shop.

26166404v5 70149.003.25

20. Any central laundry or dry cleaning plant or laundromat (except that this prohibition shall not be applicable to on-site service provided solely for pickup and delivery by the ultimate consumer, including nominal supporting facilities).

21. Any veterinary hospital, animal raising or facilities.

22. A convenience store or other retail store selling alcoholic beverages for off-premises consumption.

23. Any facility selling guns or firearms of any kind.

24. Any use that is a public or private nuisance as may be determined by the applicable municipal authorities.

25. Any use that is contrary to applicable zoning ordinances or private restrictions.

26. Any abortion, drug rehabilitation or methadone clinic.

26166404v5 70149.003.25

## THIRD AMENDMENT TO SHOPPING CENTER LEASE

This **THIRD AMENDMENT TO SHOPPING CENTER LEASE** (this "Amendment"), is made and entered into as of the 31st day of August, 2020 (the "Effective Date"), by and among **BLUE STAR FRISCO RETAIL, LLC**, a Delaware limited liability company ("Landlord"), and **TROPHY HOSPITALITY, LLC**, a Texas limited liability company ("Tenant")and joined into and consented to by **JEREMIAH MIRANDA**, an individual ( the "Guarantor").

<u>Preliminary Statements:</u>

The following preliminary statements are a material part of this Amendment:

A.      Landlord and Tenant made and entered into that certain Shopping Center Lease, dated October 26, 2016 (the "Lease"), with respect to approximately seven thousand six hundred twenty-six (7,626) square feet of floor area located in the Project commonly known as "The Star" in the City of Frisco, Collin County, Texas.

B.      Tenant's obligations under the Lease are guaranteed by Guarantor, pursuant to that certain Guaranty attached to the Lease as **Exhibit "G"**.

C.      Landlord and Tenant desire to amend the Lease as set forth in this Amendment.

D.      Capitalized terms which are used but not otherwise defined in this Amendment shall have the same meaning given to such terms in the Lease.

<u>Agreement:</u>

**NOW, THEREFORE**, in consideration of the mutual promises, covenants, terms and conditions set forth below, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant hereby agree as follows:

1.      <u>Minimum Guaranteed Rental</u>. From the period commencing on November 1, 2019 and continuing until December 31, 2020 (the "Abated Rent Period"), in lieu of Minimum Guaranteed Rental, Common Area Maintenance Payments, Insurance Escrow Payments, Tax Escrow Payments and the Marketing Fund Payments payable by Tenant pursuant to the terms and provisions of the Lease, Tenant shall pay to Landlord on a monthly basis ten percent (10%) of Gross Sales (the "Abated Rent"). Tenant and Landlord acknowledge Tenant has failed to meet its payment obligations and currently has an outstanding balance in material violation of the Lease.  In light of Tenant's outstanding balance, the parties agree that in addition to the Abated Rent, Tenant shall pay Landlord a monthly payment of Ten Thousand U.S. Dollars ($10,000.00), due and payable on or before the last day of each month, until such date that Tenant's outstanding balance is repaid in full.

2.      <u>Percentage Rent</u>. The Percentage Rental Rate set forth in Section 1.1(k) of the Lease is hereby revised to ten percent (10%). The Percentage Rental Rate will remain at ten percent (10%) until such date (the "Trigger Date") that the total Percentage Rental paid by Tenant to Landlord equals the difference between (i) the full Monthly Payment Tenant would have otherwise been obligated to pay to Landlord pursuant to the terms of the Lease during Abated Rent Period had this Amendment not been entered into (and no Abated Rent had been granted to Tenant) and (ii) the actual Abated Rent paid by Tenant during the Abated Rent Period. From and after the Trigger Date, the Percentage Rental Rate will revert to six percent (6%).

3.      <u>Sales Reports</u>. Without limiting Tenant's obligations as set forth in Article 5 of the Lease, within five (5) days after Landlord's request (such request to be made at any time during the Abated Rent



1

Period), Tenant shall prepare and deliver to Landlord a statement of daily Gross Sales made from the Demised Premises on a monthly basis and during such periods as specified by Landlord. All such daily Gross Sales statements shall be in such form as Landlord may reasonably require.

4.   Recapture. Notwithstanding anything to the contrary in the Lease, at any time during the Lease Term, Landlord may deliver written notice to Tenant terminating the Lease (the "Notice to Terminate"). On or before the date (the "Termination Date") that is thirty (30) days after Landlord's delivery of the Notice to Terminate, Tenant shall vacate the Demised Premises and surrender possession thereof in accordance with the terms and provisions of the Lease, including, without limitation, the terms of Section 8.3 of the Lease. Tenant shall continue to pay Minimum Guaranteed Rent, and all additional rentals and charges and perform all of Tenant's other covenants, duties and obligations pursuant to the terms of the Lease through and including the Termination Date.   As of the Termination Date, Tenant shall have no further right to use or occupy the Demised Premises and no other rights or obligations under the Lease, except for those obligations that may otherwise survive the expiration or termination of the Lease pursuant to the terms of the Lease. Tenant understands that Landlord shall have no obligations to Lease the Demised Premises to another tenant, such that, if Landlord fails to lease the Demised Premises prior to the Expiration Date of the lease term, Landlord shall not be deemed to be in default hereunder or otherwise liable in damages to Tenant, nor shall the terms of the Lease be affected.

5.   Renewal Option. Landlord and Tenant hereby agree that the renewal options set forth in **Exhibit "E"** of the Lease are hereby deleted in their entirety and of no further force or effect and Tenant will have no right to extend the Lease beyond the initial Lease Term.

6. Guaranty. Guarantor hereby joins in the execution of this Amendment to confirm Guarantor's consent to the terms of this Amendment and to confirm that the Guaranty is and remains in full force and effect.

7. Amendment to Lease. Tenant and Landlord acknowledge and agree that the Lease has not been amended or modified in any respect, other than by this Amendment.

8. Counterparts. This Amendment may be executed in multiple counterparts, and each counterpart, when fully executed and delivered, shall constitute an original instrument and all such multiple counterparts shall constitute but one and the same instrument.

9. Entire Agreement. The Lease and this Amendment set forth all covenants, agreements, and understandings between Landlord and Tenant with respect to the subject matter hereof, and there are no other covenants, conditions, or understandings, either written or oral, between the parties hereto except as set forth in the Lease and this Amendment.

10.   Full Force and Effect. Except as expressly amended hereby, all other items and provisions of the Lease remain unchanged and continue to be in full force and effect, and the parties hereto ratify the Lease, as amended by this Amendment.

11.   Conflicts. The terms of this Amendment shall control over any conflicts between the terms of the Lease and the terms of this Amendment.

12.   Successors and Assigns. This Amendment shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

13.   No Claims. Tenant hereby represents and warrants to Landlord that, to the best of Tenant's knowledge, (i) no default by Landlord or Tenant has occurred under the Lease, and no event or

2

Period), Tenant shall prepare and deliver to Landlord a statement of daily Gross Sales made from the Demised Premises on a monthly basis and during such periods as specified by Landlord. All such daily Gross Sales statements shall be in such form as Landlord may reasonably require.

4. <u>Recapture</u>. Notwithstanding anything to the contrary in the Lease, at any time during the Lease Term, Landlord may deliver written notice to Tenant terminating the Lease (the "<u>Notice to Terminate</u>"). On or before the date (the "<u>Termination Date</u>") that is thirty (30) days after Landlord's delivery of the Notice to Terminate, Tenant shall vacate the Demised Premises and surrender possession thereof in accordance with the terms and provisions of the Lease, including, without limitation, the terms of <u>Section 8.3</u> of the Lease. Tenant shall continue to pay Minimum Guaranteed Rent, and all additional rentals and charges and perform all of Tenant's other covenants, duties and obligations pursuant to the terms of the Lease through and including the Termination Date.   As of the Termination Date, Tenant shall have no further right to use or occupy the Demised Premises and no other rights or obligations under the Lease, except for those obligations that may otherwise survive the expiration or termination of the Lease pursuant to the terms of the Lease. Tenant understands that Landlord shall have no obligations to Lease the Demised Premises to another tenant, such that, if Landlord fails to lease the Demised Premises prior to the Expiration Date of the lease term, Landlord shall not be deemed to be in default hereunder or otherwise liable in damages to Tenant, nor shall the terms of the Lease be affected.

5. <u>Renewal Option</u>. Landlord and Tenant hereby agree that the renewal options set forth in **Exhibit "E"** of the Lease are hereby deleted in their entirety and of no further force or effect and Tenant will have no right to extend the Lease beyond the initial Lease Term.

6. <u>Guaranty</u>. Guarantor hereby joins in the execution of this Amendment to confirm Guarantor's consent to the terms of this Amendment and to confirm that the Guaranty is and remains in full force and effect.

7. <u>Amendment to Lease</u>. Tenant and Landlord acknowledge and agree that the Lease has not been amended or modified in any respect, other than by this Amendment.

8. <u>Counterparts</u>. This Amendment may be executed in multiple counterparts, and each counterpart, when fully executed and delivered, shall constitute an original instrument and all such multiple counterparts shall constitute but one and the same instrument.

9. <u>Entire Agreement</u>. The Lease and this Amendment set forth all covenants, agreements, and understandings between Landlord and Tenant with respect to the subject matter hereof, and there are no other covenants, conditions, or understandings, either written or oral, between the parties hereto except as set forth in the Lease and this Amendment.

10.   <u>Full Force and Effect</u>. Except as expressly amended hereby, all other items and provisions of the Lease remain unchanged and continue to be in full force and effect, and the parties hereto ratify the Lease, as amended by this Amendment.

11.   <u>Conflicts</u>. The terms of this Amendment shall control over any conflicts between the terms of the Lease and the terms of this Amendment.

12.   <u>Successors and Assigns</u>. This Amendment shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

13.   <u>No Claims</u>. Tenant hereby represents and warrants to Landlord that, to the best of Tenant's knowledge, (i) no default by Landlord or Tenant has occurred under the Lease, and no event or

2

circumstance has occurred which, with the giving of notice or passage of time, or both, would constitute a default by Landlord or Tenant under the Lease, (ii) Tenant has no defenses to the full and timely payment and performance of Tenant's obligations under the Lease, and (iii) Tenant has no claims against Landlord under the Lease.

14.     Confidentiality. Tenant agrees that, at all times, the existence, terms and conditions of this Amendment, including the rent concessions, shall be kept secret and confidential and will not be disclosed to any third party, except: (1) to the extent required by law; or (2) in connection with any claim to enforce, interpret or determine the scope, meaning, or effect of this Amendment.   Tenant shall pay Landlord Twenty-Five Thousand and No/100 Dollars ($25,000.00) upon its breach or threatened breach of the confidentiality obligations set forth herein ("Breach Penalty").   Landlord shall provide Tenant written notice in the event it reasonably believes such a breach has occurred and Tenant agrees to pay Landlord the Breach Penalty within three (3) business days.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]



3

**IN WITNESS WHEREOF**, Landlord and Tenant have duly executed this Amendment as of the Effective Date.

**LANDLORD:**

**BLUE STAR FRISCO RETAIL, LLC,**
a Delaware limited liability company

By:
Name: Thomas L. Walker
Title: CFO


**TENANT:**

**TROPHY HOSPITALITY, LLC,**
a Texas limited liability company

By:
Name: Jeremiah Miranda
Title: Owner


## JOINED INTO AND CONSENTED TO BY GUARANTOR

Guarantor has joined in the execution of this Amendment for the purpose of providing consent to the terms and provisions of this Amendment and acknowledging that the Guaranty remains in full force and effect to secure the payment and performance of all liabilities, obligations and duties of "Tenant" under the Lease, as amended by this Amendment.

**GUARANTOR:**

**JEREMIAH MIRANDA,**
an individual

4

**EXHIBIT B**

 

**THE STAR**

**LINCOLN PROPERTY COMPANY**

Lincoln Property Company Retail
One Cowboys Way | Suite 170 | Frisco, TX 75034
Office | 469 388 6200

March 18, 2021

**Via FedEx**

Trophy Hospitality, LLC
Attn: Jeremiah Miranda
3351 Waverly Drive
Celina, TX 75009

<u>Notice of Default</u>

**Re:** *Shopping Center Lease dated October 26, 2016 (the "Lease") by and between Blue Star Frisco Retail, LP a Texas limited partnership ("Landlord") and Trophy Hospitality, LLC, a Texas limited liability company ("Tenant") covering approximately 7,626 square feet of space at The Star (the "Demised Premises") and more particularly described in the Lease*

Dear Tenant:

According to the Landlord's records, you have an unpaid rental obligation in the amount of $149,258.55 which includes rental and other charges due through March 18, 2021. This letter shall serve as formal notification that Tenant is in default of Tenant's Lease.

If the above arrearage is not received in full within 10 days of the date of this letter, an event of default shall occur, and the Landlord will exercise those remedies for events of default described in the Lease or at Texas law with no further notice whatsoever.

**You are required to deliver the unpaid rental amount set forth above to the following address within ten (10) days from the date of this letter:**

> Blue Star Frisco Retail, LLC
> c/o Lincoln Property Company
> One Cowboys Way, Suite 170
> Frisco TX 75034

Please be advised that partial payments will be not accepted. Therefore, unless the account is paid in full within the ten (10) days allowed in the amount stated above, the Landlord will immediately pursue any and all remedies available to collect all monies due.

Do not construe the Landlord's failure to immediately take action against you in the past as a waiver of any of its rights to do so now or in the future.

Sincerely,
LINCOLN PROPERTY COMPANY COMMERCIAL, INC.

Colleen Burrows

Colleen Burrows
Senior Property Manager

cc: Tenant File

Scanned with CamScanner

**After printing this label:**
1. Use the 'Print' button on this page to print your label to your laser or inkjet printer.
2. Fold the printed page along the horizontal line.
3. Place label in shipping pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.

Warning: Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number.

Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com.FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery,misdelivery,or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim.Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental,consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss.Maximum for items of extraordinary value is $1,000, e.g. jewelry, precious metals, negotiable instruments and other items listed in our ServiceGuide. Written claims must be filed within strict time limits, see current FedEx Service Guide.

ORIGIN ID:ADSA    (469) 388-6200
CHRISTA THIGPEN
LINCOLN PROPERTY COMPANY
ONE COWBOYS WAY
SUITE 170
FRISCO, TX 75034
UNITED STATES US

TO JEREMIAH MIRANDA
TROPHY HOSPITALITY, LLC
3351 WAVERLY DRIVE

CELINA TX 75009
(000) 000-0000
INV:
PO:
DEPT:

REF: THE STAR - RETAIL

SHIP DATE: 18MAR21
ACTWGT: 0.10 LB
CAD: 111116145/INET4340

BILL SENDER

FedEx Express

FRI - 19 MAR 4:30P
STANDARD OVERNIGHT

75009
TX-US        DFW

TRK# 7732 0151 3560
0201

AD DNEA

Scanned with CamScanner

**EXHIBIT C**

  

Lincoln Property Company Retail
One Cowboys Way | Suite 170 | Frisco, TX 75034
Office | 469 388 6200

March 30, 2021

**Via FedEx and electronic mail**

Trophy Park, LLC
Attn: Jeremiah Miranda
4331 Hollow Oak Drive
Dallas, TX 75287

### Event of Default

**Re:** *Shopping Center Lease dated October 26, 2016 (the "Lease") by and between Blue Star Frisco Retail, LP a Texas limited partnership ("Landlord") and Trophy Hospitality, LLC, a Texas limited liability company ("Tenant") covering approximately 7,626 square feet of space at The Star (the "Demised Premises") and more particularly described in the Lease*

Dear Tenant:

This letter shall serve as formal notice to Tenant that Tenant is in an Event of Default of the Lease as a result of Tenant's failure to pay Rent when due as set forth in the Lease and its continued failure to pay Rent after receiving written notice of the outstanding charges on March 18, 2021. Pursuant to ARTICLE XIX Section 19.1(1) of the Lease, "Tenant shall fail to pay any amount due to Landlord as herein provided and such failure shall continue for a period of ten (10) days after written notice of such default," shall be deemed to be an Event of Default.

According to the Landlord's records, you have an unpaid rental obligation in the amount of $149,258.55 which includes rental and other charges due through March 18, 2021, which was not paid in full.

The Landlord <u>has the right to exercise</u> those remedies for events of default described in the Lease or at Texas law with <u>no further notice whatsoever</u>.

Do not construe the Landlord's failure to immediately take action against you in the past as a waiver of any of its rights to do so now or in the future.

Sincerely,
LINCOLN PROPERTY COMPANY COMMERCIAL, INC.

*Colleen Burrows*

Colleen Burrows
Senior Property Manager

cc:     Tenant File
        Tom Walker
        Kaleisha Stuart
        Jason Cohen
        Melanie J. Cogburn

# EXHIBIT D



Filed and Recorded
Official Public Records
Stacey Kemp, County Clerk
Collin County, TEXAS
07/29/2020 09:01:10 AM
$74.00 TBARNETT
20200729001195020

20200729001195020   07/29/2020 09:01:10 AM MF  1/13

**LIEN AFFIDAVIT MECHANIC'S LIEN RECORDED UNDER INSTRUMENT NO.**
_____ **IN THE REAL PROPERTY RECORDS FOR COLLIN**
**COUNTY, TEXAS.**

**STATE OF TEXAS**            §

**COUNTY OF COLLIN**          §

BEFORE ME, the undersigned authority, personally appeared Ryan Finan, who upon an oath, deposed and stated the following:

1. My name is Ryan Finan and I am a resident of Collin County, Texas. I am the Managing Member of Green Tag Construction, LLC (hereinafter referred to as the "Claimant"). I am over 18 years of age. I am competent and authorized to make this affidavit. I have personal knowledge of the facts stated herein.

2. The property sought to be charged with a lien by Claimant is the leasehold interest and all removable items located therein for the Frisco Multi-event Center at 6776 Winning Drive, Frisco, Texas 75034, which is legally described as: Frisco Multi-event Center Addition, Blk C Lot 3, in the Building consisting of (i) approximately 7,305' square feet of rentable area within the interior of the Building (the Interior Space) and (ii) 3,910' square feet of rentable area of patio space on the Premises (the Outdoor Patio). The building commonly known as Frisco Multi-event Center Addition, Blk C Lot 3 to be located in the Frisco Multi-event Center Addition, Blk C Lot 3.

3. Claimant's mailing address and physical address is 3121 McKinney St., Melissa, Texas 75454.

4. Claimant furnished labor, materials, and/or equipment for the improvement of the Property owned by Blue Star Frisco Retail LLC, ("Owner") whose last known address is: 1 Cowboys way, Frisco, Texas 75034, that are generally described as general contractor services and all labor, materials, and equipment necessary for obtaining a certificate of occupancy for the Trophy Park Restaurant at the Property.

5. Claimant furnished the above-described labor and materials to the Property under a stipulated lump sum contract with the tenant of Owner, Trophy Park Hospitality LLC, whose last known address is: 6776 Winning Drive, Suite 900.

6. After allowing all just credits, offsets, and payments made to Claimant, the principal amount of $171,041.89 remains unpaid and is due and owing to Claimant for its work, which excludes attorneys' fees, interest.

7. Claimant herein claims a statutory lien against the Property and improvements thereon under the provisions of TEXAS PROPERTY CODE § 53.001, et seq., to secure

payment of said amount. In its capacity as an Original Contractor, Claimant further claims a constitutional lien against the Property, and improvements made thereon pursuant to ARTICLE XVI, SECTION 37 of the TEXAS CONSTITUTION.

8. A copy of this Statutory and Constitutional Lien Affidavit is being sent via certified mail, return receipt requested, to the Property Owners at the address identified above.

By: Ryan Finan, Managing Member
GREEN TAG CONSTRUCTION, LLC

STATE OF TEXAS §

COUNTY OF COLLIN §

BEFORE ME, THE UNDERSIGNED NOTARY PUBLIC, on this day personally appeared , known to me to be the person whose name is subscribed to the foregoing instrument, and subscribed and sworn before me, as well as acknowledged to me that such person executed the same for the purposes and consideration therein expressed, and swore that the facts contained therein are true and correct.

GIVEN UNDER MY HAND AND SEAL OF THIS OFFICE the _28th_ day of _July_, 20 _20_. Notary Public in and for the State of Texas My Commission on Expires: _12 March 2022_

ANGELA ROMERO
Notary ID #5907334
My Commission Expires
March 12, 2022

Notary Public   ANGELA ROMERO



20200818001346450    08/18/2020 09:48:02 AM RE 1/2

### RELEASE OF MECHANIC'S AND MATERIALMAN'S LIEN

STATE OF TEXAS

COUNTY OF COLLIN

BEFORE ME, the undersigned authority, personally appeared Ryan Finan, as the authorized representative and President of Green Tag Construction, LLC, who upon his oath, deposed and stated as follows:

*Green Tag Construction, LLC* has been paid in full for all labor, services, equipment, or materials furnished to the property or to *Trophy Park Hospitality, LLC,* on the following described real property located at 6776 Winning Drive, Frisco, Texas 75034, Collin County, Texas:

Frisco Multi-event Center Addition, Blk C Lot 3, in the Building consisting of (i) approximately 7,305' square feet of rentable area within the interior of the Building (the Interior Space) and (ii) 3,910' square feet of rentable area of patio space on the Premises (the Outdoor Patio). The building commonly known as Frisco Multi-event Center Addition, Blk C Lot 3 to be located in the Frisco Multi-event Center Addition, Blk C Lot 3.

*Green Tag Construction, LLC* therefore waives and releases any mechanic's lien right, any right arising from a payment bond that complies with a state or federal statute, any common law payment bond right, any claim for payment, and any rights under any similar ordinance, rule, or statute related to claim or payment rights for persons in the signer's position. Further, *Green Tag Construction, LLC,* specifically releases the mechanic's lien filed in the real property records of Collin County, Texas under instrument number 20200729001195020.

Signed this _____17_____ day of _____AUGUST_____, 2020.

Green Tag Construction, LLC
By: Ryan Finan
Its: President

SUBSCRIBED AND SWORN TO BEFORE ME on the 17th day of _____August_____, 2020, to certify which witness my hand and seal of office.

ANGELA ROMERO
Notary ID #5907334
My Commission Expires
March 12, 2022

Notary Public, State of Texas

After recording please return to:
McCathern, PLLC, attn. Jesse Cromwell, 3710 Rawlins St., Suite 1600, Dallas, TX 75219.

Filed and Recorded
Official Public Records
Stacey Kemp, County Clerk
Collin County, TEXAS
08/18/2020 09:48:02 AM
$30.00 NPRECELLA
20200818001346450



## EXHIBIT E

**UCC FINANCING STATEMENT**

**FOLLOW INSTRUCTIONS**

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
Lien Solutions

**B. E-MAIL CONTACT AT FILER (optional)**

**C. SEND ACKNOWLEDGMENT TO: (Name and Address)**
**CT Lien Solutions
2929 Allen Parkway, Ste. 100
Houston, TX 77019
USA

**FILING NUMBER:** 19-0003621446
**FILING DATE:** 01/30/2019     02:34 PM
**DOCUMENT NUMBER:** 865059650001
**FILED: Texas Secretary of State**
**IMAGE GENERATED ELECTRONICALLY FOR XML FILING**
**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

1. DEBTOR'S NAME - Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR  Trophy Hospitality, LLC | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 6670 Winning Drive, Suite 900 | Frisco | TX | 75034-7650 | USA |

2. DEBTOR'S NAME - Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR  Trophy Park | | | |
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 6670 Winning Drive, Suite 900 | Frisco | TX | 75034-7650 | USA |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY) - Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR  Celtic Bank Corporation | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 268 S. State St., Ste 300 | Salt Lake City | UT | 84111 | USA |

4. COLLATERAL: This financing statement covers the following collateral:
All Inventory, Chattel Paper, Accounts, Equipment, and General Intangibles;
whether any of the foregoing is owned now or acquired later; all accessions,
additions, replacements, and substitutions relating to any of the foregoing; all
records of any kind relating to any of the foregoing; all proceeds relating to
any of the foregoing (including insurance, general intangibles and other
accounts proceeds)

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box.
☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:

FILING OFFICE COPY

## UCC FINANCING STATEMENT AMENDMENT
FOLLOW INSTRUCTIONS

**19-00346809**

**09/10/2019 05:00 PM**

**FILED**

TEXAS
SECRETARY OF STATE

SOS

913078350002

A. NAME & PHONE OF CONTACT AT FILER (optional)
Phone: (800) 331-3282 Fax: (818) 662-4141

B. E-MAIL CONTACT AT FILER (optional)
CLS-CTLS_Glendale_Customer_Service@wolterskluwer.com

C. SEND ACKNOWLEDGMENT TO: (Name and Address)    15331 - CELTIC BANK

Lien Solutions          71579063
P.O. Box 29071
Glendale, CA 91209-9071    TXTX

RECEIVED
SEP 10 2019

File with: Secretary of State, TX

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

| 1a. INITIAL FINANCING STATEMENT FILE NUMBER | 1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13 |
|---|---|
| 190003621446   1/30/2019  SS TX | |

2. ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

3. ☐ **ASSIGNMENT (full or partial):** Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

4. ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

5. ☐ **PARTY INFORMATION CHANGE:**

Check **one** of these two boxes:                                                   **AND** Check **one** of these three boxes:

This Change affects ☐ Debtor **or** ☐ Secured Party of record

☐ CHANGE name and/or address: Complete item 6a or 6b; and item 7a or 7b and item 7c
☐ ADD name: Complete item 7a or 7b, and item 7c
☐ DELETE name: Give record name to be deleted in item 6a or 6b

6. **CURRENT RECORD INFORMATION:** Complete for Party Information Change - provide only **one** name (6a or 6b)

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

7. **CHANGED OR ADDED INFORMATION:** Complete for Assignment or Party Information Change - provide only **one** name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 7b. INDIVIDUAL'S SURNAME | | | |
| INDIVIDUAL'S FIRST PERSONAL NAME | | | |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

8. ☒ **COLLATERAL CHANGE:** Also check **one** of these four boxes: ☒ ADD collateral  ☐ DELETE collateral  ☐ RESTATE covered collateral  ☐ ASSIGN collateral

Indicate collateral:
All Inventory, Chattel Paper, Accounts, Equipment, and General Intangibles; whether any of the foregoing is owned now or acquired later; all accessions, additions, replacements, and substitutions relating to any of the foregoing; all records of any kind relating to any of the foregoing; all proceeds relating to any of the foregoing (including insurance, general intangibles and other accounts proceeds) Purchase Money Security Interest: in all equipment

9. **NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT:** Provide only **one** name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

| 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Celtic Bank Corporation | | | |
| 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

10. OPTIONAL FILER REFERENCE DATA:  Debtor Name: Trophy Hospitality, LLC
71579063          15014819

Prepared by Lien Solutions, P.O. Box 29071,
Glendale, CA 91209-9071 Tel (800) 331-3282